**RECORD NO. 14-2048**

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

JOYCE ANDERSON,

*Plaintiff-Appellant,*

v.

CONSOLIDATION COAL COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

**OPENING BRIEF OF APPELLANT
JOYCE ANDERSON**

Allan N. Karlin WV Bar # 1953
Jane E. Peak WV Bar # 7213
ALLAN N. KARLIN & ASSOCIATES
174 Chancery Row
Morgantown, WV 26505
(304) 296-8266
Ankcubs@aol.com
jep@wvjustice.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                              YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES     NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     YES     NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                            YES     NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
          (signature)                                        (date)

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT ............................................................... 8

STANDARD OF REVIEW ................................................................... 10

ARGUMENT ...................................................................................... 10

    I.      Introduction ........................................................................ 10

    II.     The District Court erred in granting summary judgment on Anderson's disability discrimination claim where CCC fired her based on its alleged belief that she presented a risk of injury to herself without applying the analysis required by W. Va. C.S.R. § 77-1-4.8. ................................................................. 11

          A.     The district court failed to conduct the analysis required by W. Va. C.S.R. § 77-1-4.8 ......................................................... 11

          B.     Anderson presented evidence from well qualified osteoporosis experts that Anderson should have been allowed to return to work ........................................................ 15

          C.     The district court erred in failing to recognize genuine issues of material fact concerning the competence and credibility of Dr. Steinman's opinions and whether those opinions complied with § 77-1-4.8 ......................................................... 19

i

       D.      The reports of Dr. Sethi or Dr. Ripepi also raise genuine issues of material fact..................................................................28

       E.      Conclusion ...............................................................................30

III.   There are genuine issues of material fact as to whether CCC acted in good faith.........................................................................................31

       A.      The District Court erred in ruling for CCC based on the CBA...........................................................................................34

       B.      The District Court erred in granting summary judgment on Anderson's disability discrimination claim where the Consolidation Coal Company because it failed to consider substantial portions of the evidence submitted in support of Anderson's opposition to summary judgment and because it resolved disputed facts against her. ...........................................37

IV.   The District Court erred in granting summary judgment on Anderson's claim that her workers' compensation claim was a significant factor in the decision to terminate her employment because it failed to consider substantial portions of the evidence she submitted in opposition to summary judgment and because it resolved disputed facts against her.......................................................41

CONCLUSION .........................................................................................48

REQUEST FOR ORAL ARGUMENT ................................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM –

WV Human Rights Commission Legislative Rules Title 77

ii

# TABLE OF AUTHORITIES

## CASES

*14 Penn Plaza LLC v. Pyett*,
    556 U.S. 247 (2009)................................................................35, 37

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................10

*Axel v. Duffy-Mott Co.*,
    389 N.E.2d 1075 (N.Y. 1979) .........................................................42

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)....................................................................33

*Branham v. Snow*,
    392 F.3d 896 (7th Cir. 2004) .........................................................14

*Calef v. FedEx Ground Packaging Sys.*,
    343 Fed. Appx. 891(4th Cir. 2009) ...............................................12

*Chevron U.S.A. v. Echazabal*,
    536 U.S. 73 (2002)................................................................13, 14

*Conaway v. Eastern Associated Coal Corp.*,
    178 W. Va. 164 (1986) ............................................................12, 43

*Echazabal v. Chevron USA, Inc.*,
    336 F.3d 1023 (9th Cir. 2002) ...................................................33, 34

*Lowe v. Ala. Power Co.*,
    244 F.3d 1305 (11th Cir. 2001) .......................................................39

*Moore v. Winebrenner*,
    927 F.2d 1312 (4th Cir.) *cert. denied,* 502 U.S. 828 (1991) ...........................10

*Nestor v. Bruce Hardwood Floors, L.P.*,
    210 W. Va. 692 (2001) ............................................................42, 43

*Powell v. Wyo. Cablevision*,
 184 W. Va. 700 (1991) .......................................................................41, 42, 43

*Skaggs v. Elk Run Coal Co.*,
 198 W. Va. 51 (1996) ................................ 22, 23, 25, 27, 29, 43

*Skaggs v. Elk Run Coal Co.*,
 212 W. Va. 248 (2002) .........................................................................4, 12

*Stone v. St. Joseph's Hospital*,
 208 W. Va. 91 (2000) ..................................................................12, 15, 30, 40

## STATUTES

28 U.S.C. § 1291 ............................................................................................1
28 U.S.C. § 1332 ............................................................................................1
28 U.S.C. § 1441 ............................................................................................1

29 C.F.R. § 1630.15 (b)(2)............................................................................13
29 C.F.R. § 1630.2 (r) ..............................................................................13, 34

W. Va. Human Rights Act ("HRA"), W. Va. Code § 5-11-1 *et. seq*........................1
W. Va. Workers' Compensation Act ("WCA"), W. Va. Code § 23-1-1 *et. seq* ....1, 9
W. Va. C.S.R. § 77-1-4.8...................................................................1, 7, 11
W. Va. Code § 23-5A....................................................................................46
W. Va. Code § 23-5A-3 ................................................................................46

## RULES

Fed. R. App. P. 4(a)(1)(A) ............................................................................1
Fed. R. Civ. P 56 (c)  ...........................................................................10, 11

## JURISDICTIONAL STATEMENT

This case arises under the West Virginia Human Rights Act ("HRA"), W. Va. Code § 5-11-1 *et seq.*, and the West Virginia Workers' Compensation Act ("WCA"), W. Va. Code § 23-1-1 *et seq.*  The case was filed in the Circuit Court of Marion County, West Virginia, and removed by the defendant to the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1441.  The district court had jurisdiction based on diversity pursuant to 28 U.S.C. § 1332.

On September 5, 2014, the district court granted summary judgment in favor of defendant Consolidation Coal Company ("CCC") on all claims and the clerk entered final judgment against Joyce Anderson.  Joint Appendix ("JA") JA1051. Anderson timely filed her Notice of Appeal on October 1, 2014.  Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the District Court erred in granting summary judgment on Anderson's disability discrimination claim where CCC fired her based on its alleged belief that, because of her osteoporosis, she presented a risk of injury to herself or others without applying the analysis required by W. Va. C.S.R. § 77-1-4.8, the regulation that applies when an employer discharges an employee because it believes that she poses a "direct threat" to  herself and/or others.

2.     Whether the District Court erred in granting summary judgment on Anderson's disability discrimination claim because it failed to consider substantial

1

portions of the evidence submitted in support of Anderson's opposition to summary judgment and because it resolved disputed facts against her.

3.    Whether the District Court erred in granting summary judgment on Anderson's claim that her filing of a workers' compensation claim was a significant factor in the decision to terminate her employment because it failed to consider substantial portions of the evidence submitted in support of Anderson's opposition to summary judgment and because it resolved disputed facts against her.

## STATEMENT OF THE CASE

Joyce Anderson, formerly Joyce Lopez, a long term employee of CCC, brought this wrongful discharge case contending that CCC violated the West Virginia Workers' Compensation Act ("WCA") and the West Virginia Human Rights Act ("HRA") when it discharged her from employment because, according to CCC, her osteoporosis placed her at high risk for future fractures if she returned to her job as a bunker attendant at the Loveridge Mine.

Anderson started working as a miner in 1981.  JA0093.  She has been, at all relevant times, an active woman who walks, runs, rides motorcycles with friends, rides four wheelers with her grandchildren and sometimes plays golf.  JA0265; JA0263 (referencing her motorcycle riding); JA0702.

On November 3, 200 9, Anderson suffered an injury related to her osteoporosis when she fell and fractured her pelvis and elbow at work.  JA0076, JA0082. Dr. McKinley, her orthopedic surgeon, explained that Anderson's pelvic fractures did not require surgery: "[t]hey were stable fractures.  They did not alter the joints

2

attached to the bones involved.  And with regard to the pelvis, they did not involve the weightbearing aspect of the bone."  JA0237.  In late March, Dr. McKinley and Anderson's physical therapist released Anderson to return to her regular work as a bunker attendant without restrictions.  JA0255-256; Joint Appendix Sealed ("JA-S") JA-S 1668, JA-S 1654 (Physical Therapy Records: "RTW Full Duty").

As a bunker attendant, Anderson did not work at the face where coal was mined.  JA0199-200.  She worked in a well lit and level area of the mine.  JA0166-67 ("Once you get to the bunker, that's all lit up.  I mean, it's – there's – there's a ton of lights at the bunker."); JA0186, JA0199-200.  Ms. Anderson generally rode, not walked, to her workplace in a mine vehicle.  JA0161-63.  Her job required her to climb stairs, use a rock duster and shovel coal when there was spillage from the conveyor belt (JA0105-08), but she did not have a history of falling down in the bunker job or other jobs she had worked.  JA-0266 (paragraph 8); JA0209-210 (Answer to Request No. 5 stating her injuries resulting from falling prior to her fall in 2009); JA0091-93.

CCC did not always require a miner who was off work due to an injury to undergo a medical evaluation before allowing the miner to return to work, but it required one in Anderson's case.[1]  Prior to learning of CCC's decision, Anderson received a call from a Wells Fargo employee who worked on her workers'

---

[1]  Anderson's return to work physical was not required by CCC policy.  CCC policy only mandated a physical if an employee was off from work for six months. JA0875 (Response to Request No. 9 stating return to work physicals were required when an employee has been off for six months or, otherwise, on a case by case basis). Anderson was cleared to return to work in late March 2010, less than six months after her November 2009 injury.  JA0218.

3

compensation claim.[2]  JA0136-137.  The employee advised Anderson that CCC was "going to make an issue of the osteoporosis." *Id.*  She told Anderson "that the company was trying to put the screws to [Anderson]," and told Ms. Anderson to contact an attorney or her union representative. *Id.*

Helen Blevins, Manager of Occupational and Nonoccupational Healthcare for CONSOL Energy, Inc. ("CONSOL"), directed that Anderson be evaluated before she be allowed to return to work because of Blevins' concern that Anderson's osteoporosis would result in a future injury as had occurred with another female miner who had osteoporosis.[3]  JA0486 (email from Burford stating she had "just confirmed with Helen [Blevins that she [Blevins] wants another IME set up on this employee [Anderson] just like [Jones]");[4] JA0870 (email to the General Manager of the Benefits Program telling him that Anderson was "another Mrs. Jones.")."[5] Notably, Blevins could only recall two miners who were denied the opportunity to

---

[2]  Wells Fargo was acting as an agent for CCC. *See, e.g.*, *Skaggs v. Elk Run Coal Co.*, 212 W. Va. 248, 252, 254, 256-257 (2002) (*"Skaggs II"*) (a workers compensation claims adjuster and a rehabilitation services company are agents or representatives of the employer).

[3]  CONSOL was, at the time, the parent of CCC. Anderson agreed to dismiss CONSOL from this case on the condition that CONSOL and CCC be treated as one entity in this litigation. Blevins, an employee of CONSOL, was involved in the decisions concerning Anderson. Her actions are attributable to CCC pursuant to this agreement.

[4]  The email is from Burford to Dr. Steinman's wife, who was a Wells Fargo employee.

[5]  Mrs. Jones is the pseudonym used to refer to the other female miner. As discussed *infra,* a physician with expertise in osteoporosis would have recognized the reasons why Anderson was not likely to be another Mrs. Jones.

4

return to work because they were at a high risk of injury to themselves: Joyce Anderson and Mrs. Jones, the other female miner with osteoporosis. JA-S1278.

Blevins worked for CONSOL from October 1980 through December 2012. JA0364. Initially Blevins was in CONSOL's medical group, but in 2000 she became Manager of Occupational and Nonoccupational Healthcare where her work included overseeing Wells Fargo's administration of CCC's workers' compensation clinical program. JA0364-66. Blevins, who was educated as a nurse, would "review claims with them [Wells Fargo], look at any type of clinical approvals that were necessary in order for them to continue case management on claims." JA0451-452; JA0366. She had the right to approve or disapprove of some of Wells Fargo's actions. JA366-367. According to the HR manager at Anderson's mine, Blevins was the top person for workers' compensation at CONSOL. JA0205.

Given Blevins' experience, she certainly knew the importance of choosing an evaluator with expertise in osteoporosis. Blevins, however, directed Wells Fargo to arrange Anderson's evaluation with Dr. Steinman, a physician who had no expertise in osteoporosis. JA0495; JA0500; JA0512; JA0474. Steinman, relying on an article which he totally misread, recommended that Anderson not return to work because of the risk of future fractures resulting from her osteoporosis. JA-S 1178; JA0568; JA0569-570; JA0581-585. Thus, Dr. McKinley and Dr. Steinman disagreed on whether Anderson should be allowed to return to work.

Under Article III(j) of the UMWA collective bargaining agreement ("CBA"), where two doctors disagree on a miner's fitness to return to work, the union and CCC submit names of other doctors, one of whom is selected, ultimately in a draw out of

a hat, to perform an additional evaluation.  JA0097-0100; JA1300.  Dr. Sethi, whose name was submitted by CCC on Blevins' recommendation, was selected as the third doctor through the III(j) process. JA0783; JA-S1599-1560.  Blevins recommended Dr. Sethi as an evaluator even though he, like Steinman, had no expertise in osteoporosis.  JA0782; JA0783; JA0803; JA0814.  When Dr. Sethi concurred with Dr. Steinman, CCC indicated its intent to discharge Anderson.[6]  Anderson then pursued a grievance under the CBA.  JA0854 .

The arbitrator, concluding that the CBA limited his authority to considering whether two of the three doctors provided opinions adverse to Anderson, ruled against Anderson based solely on the limited provisions of the CBA, not on any rights she might have under state law.  JA0869.  This was consistent with CCC's submissions to the arbitrator which argued that the arbitration was limited to Anderson's rights under the CBA and that her rights under state law would have to be addressed in another forum.  JA0827.  The arbitrator agreed with CCC, concluding that he did "not have authority or jurisdiction to consider or rule upon whether or not the Employer violated any provision of the West Virginia Workers' Compensation Act or any other external laws in refusing to allow Grievant Joyce Lopez [Anderson] to return to work and in terminating her employment."  JA0854.

Anderson then filed this wrongful discharge case asserting her West Virginia claims.  JA0010.

---

[6]   CCC also asked for a chart review by Dr. Ripepi who was not familiar with the relevant osteoporosis literature and who, without any research or investigation of his own, agreed with Dr. Steinman.  JA0770-772.

Early in the case, CCC filed a motion to dismiss raising a number of issues including CCC's contention that Anderson's claims are preempted by Section 301 of the Labor Management Relations Act.  Document 40.  The District Court denied CCC's motion in a detailed memorandum opinion.  JA1024.

After discovery concluded, CCC filed its motion for summary judgment.  JA0065.  In opposing the motion, Anderson contended that her filing of a workers' compensation claim (and CCC's fear that she would file future claims) was a significant factor in CCC's decision to discharge her from employment in violation of the WCA.  Document 253.  She also contended that her discharge violated W. Va. C.S.R. § 77-1-4.8 ("§ 77-1-4.8") (*see* addendum).  This State Legislative Rule applies to this case because CCC's non-discriminatory reason for the discharge was based on its contention that Anderson's osteoporosis posed a direct threat to her health or safety.  She contended that CCC violated § 77-1-4.8 because, contrary to its usual practice, the doctors whom it chose or recommended to evaluate Anderson lacked any expertise in osteoporosis and failed to make an "individualized assessment" that relied on the "most current medical knowledge and/or on the best available objective evidence" as required by the Rule.[7]  *Id.*

Anderson presented evidence from two well qualified specialists in osteoporosis and from Anderson's orthopedic surgeon who agreed that the risks to Anderson should not have prohibited her from returning to work.  JA0616-618;

---

[7]    She also contended that CCC's policies and practices in determining whether to discharge an individual with osteoporosis have a disparate impact on women in violation of the HRA.  However, she is not pursuing this issue on appeal.

JA0630-632; JA0700-703. She also submitted evidence challenging CCC's motives, credibility and good faith in (a) its selection of doctors to evaluate Anderson, (b) its treatment of Anderson and (c) the reasons it offered to justify its actions. *See* discussion *infra*. Finally, she submitted evidence that the doctors upon which CCC relied in the III (j) process not only lacked the "current medical knowledge" required by § 77-1-4.8; they also completely misunderstood the medical study on which they relied, and they likely harbored a bias in favor of CCC.

On September 5, 2014, the district court granted CCC's Motion for Summary Judgment. JA1024 - 1050.

## SUMMARY OF ARGUMENT

The district court erred in granting CCC's Motion for Summary Judgment. According to CCC, Anderson was discharged because her osteoporosis posed a high risk that she would fall and injure herself if she returned to work. Under the HRA, this reason for discharging an individual with an actual or perceived disability is addressed by § 77-1-4.8. An employer who discharges an employee with a disability based on its belief that the employee's disability is a "direct threat" to the health or safety of herself or others must comply with § 77-1-4.8. ***Thus, to lawfully discharge Anderson, CCC was required to comply with § 77-1-4.8.*** This provision is an affirmative defense that requires the employer to prove that the medical opinion upon which it relies was based on an "individualized assessment" of the employee, on "competent medical advice" and on the "most current medical knowledge" in the relevant field. CCC's duty under this State Rule is independent of and in addition to its duties under the CBA.

8

CCC's discharge of Anderson failed to comply with § 77-1-4.8 for a number of reasons including its selection and recommendation of evaluators whom it knew or should have known had little or no expertise in osteoporosis, who lacked "current medical knowledge" about the disease and who did not provide competent opinions about Anderson's risk of future injury. In contrast, Anderson presented the opinions of two highly qualified osteoporosis experts and of her treating orthopedic surgeon who were all familiar with the "most current medical knowledge" and who explained why Anderson should have been allowed to return to work. Moreover, CCC's reliance on medical evaluators who lacked the requisite medical knowledge was contrary to CCC's normal practice of choosing medical evaluators with the appropriate expertise. In ruling for CCC despite the evidence presented by Anderson, the district court failed to discuss or apply the analysis required by § 77-1-4.8 and construed disputed facts and inferences against Anderson.

The court also erred in granting summary judgment on Anderson's workers' compensation discrimination/retaliation claim. Anderson's discharge violated W. Va. Code § 23-1-1 *et seq.* because CCC's concern about her workers' compensation claim and/or future claims was a significant factor in CCC's decision to terminate her employment in violation of the WCA. Anderson presented evidence from which a jury could reasonably infer that CCC's decision to challenge her return to work, the manner in which it went about doing so and her eventual discharge were done with the motive and intent of terminating her employment because of concerns about the cost of her workers' compensation claim(s). The district court erred because it failed

to consider all of the facts and inferences presented by Anderson and resolved disputed facts against her in violation of the summary judgment standard.

## STANDARD OF REVIEW

This Court reviews a district court's decision granting summary judgment under a *de novo* standard of review. *Moore v. Winebrenner*, 927 F.2d 1312, 1313 (4th Cir.) *cert. denied*, 502 U.S. 828 (1991). Summary judgment is appropriate only if it is clear that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reaching its decision, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

### I.    Introduction

This case raises important questions about the issues that arise when an employer seeks to discharge an employee because she allegedly presents a risk to herself or others under the "direct threat" provisions of the HRA and about the use and abuse of alleged medical experts chosen by an employer more because of their relationship to the employer than because of their knowledge of or expertise in the relevant medical issues. These issues arise in the context of stereotyped perceptions of the fragility of a female coal miner with osteoporosis.

The district court's decision fails to discuss most of the facts and inferences on which the plaintiff relied in opposing summary judgment. Anderson's submissions in opposition to summary judgment were extensive including excerpts from twelve

depositions, discovery responses and other documents. Yet, little of that evidence is mentioned in the district court's opinion. Instead, in a footnote, the district court states "[f]or the purposes of this opinion, this Court adopts, for the most part, ***the facts as set forth by the plaintiff in the amended complaint***." JA1028 (emphasis added). There are two problems with the court's statement. First, the court should have relied on the exhibits submitted in opposition to summary judgment, not on the facts alleged in the amended complaint.[8] FRCP 56 (c). Second, it is not clear that the court actually adopted most of the facts in the First Amended Complaint.

The impact of the discharge on Anderson is significant. At the age of 52, she lost her job as a coal miner. Because she lost her job before she was 55, her discharge resulted in both a substantial decrease in her vested pension and the loss of lifetime healthcare benefits. JA0143 ("I lost 48.27 percent of my pension . . . ."); JA0168-0169 (listing economic losses).

**II.    The District Court erred in granting summary judgment on Anderson's disability discrimination claim where CCC fired her based on its alleged belief that she presented a risk of injury to herself without applying the analysis required by W. Va. C.S.R. § 77-1-4.8.**

**A.    The district court failed to conduct the analysis required by W. Va. C.S.R. § 77-1-4.8**

Anderson presented a prima facie of disability discrimination by establishing:

---

[8]    The district court's decision is perplexing for other reasons. For example, the court wrote "[a]fter a review of the record, this Court is unable to determine the exact name of the union of which the plaintiff was a member." Yet, there are multiple references to the UMWA in the parties' legal memoranda (Document 208-1 at 1, 2, 5, 20, 33; Document 253, 15) and in the exhibits including an excerpt from the CBA (JA-S 1299); the Arbitrator's decision (JA0854); and Anderson's Grievance, (JA-S 1439).

1.    That the plaintiff is a member of a protected class.

2.    That the employer made an adverse decision concerning the plaintiff.

3.    But for the plaintiff's protected status, the adverse decision would not have been made.

Syl. Pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W. Va. 164, 167 (1986). The district court agreed that Anderson was a disabled person within the meaning of the HRA and that CCC made an adverse decision against her.[9] JA1043-44. The district court, however, mistakenly concluded that CCC did not "base the decision to terminate the plaintiff solely on the grounds that she was disabled . . .." JA1044. As a result, the district court failed to address § 77-1-4.8 even though the provision clearly applies.

First, Anderson ***was*** discharged because of her osteoporosis based on CCC's contention that it posed a risk of future injury.[10]  Although some doctors offered

---

[9]    Anderson was disabled within the meaning of West Virginia law given CCC's perception and treatment of her as someone unable to perform coal mining or similar work. *See Stone v. St. Joseph's Hosp.*, 208 W. Va. 91, 107-108 (2000) (plaintiff made a sufficient showing that he was regarded as having a substantially limiting impairment to qualify as disabled under the HRA where his employer treated him as a person who should not be entrusted with the regular duties of his job, which included driving and caring for, lifting, and carrying patients). Note: West Virginia law is "not mechanically tied to federal disability discrimination jurisprudence" and has historically interpreted "disability" more favorably to employees than federal law. *Id.* at 208. *See also Calef v. FedEx Ground Packaging Sys.*, 343 Fed. Appx. 891, 896 (4th Cir. 2009) (observing that the HRA is "often corresponding with -- but sometimes straying from -- the Americans with Disabilities Act.").

[10]    The statement is also mistaken because the law does not require that a disability be the "sole reason" for the discharge as West Virginia recognizes a mixed motive case. *See, e.g.*, *Skaggs v. Elk Run Coal Co.*, 212 W. Va. 248, 252, 254, 256-257 (2002) (*"Skaggs II")* (recognizing workers' compensation claims adjuster and rehabilitation services company as agents or representatives of the employer).

12

opinions that supported CCC, their opinions do not change that fact that Anderson was, according to CCC, discharged because of an alleged fracture risk resulting from osteoporosis. JA0181. Thus, although Anderson could do her job, she was denied the opportunity to work because CCC contended that her disability, *i.e.*, osteoporosis, placed her at risk for future injury to herself.

This is precisely the factual situation that § 77-1-4.8 is designed to address. Where the reason for discharging an employee involves a disability or perceived disability that allegedly poses a risk of injury to oneself or others, the employer must demonstrate medical opinions that satisfy the criteria in § 77-1-4.8. However, instead of analyzing the medical opinions under § 77-1-4.8, the district court apparently concluded that § 77-1-4.8 did not apply because CCC terminated her "[r]elying on these medical opinions, and not simply the plaintiff's status as 'disabled' or her gender. . .." JA1044. However, the fact that doctors chosen by CCC supported CCC's decision does not alter the fact that Anderson was discharged because of CCC's alleged belief that her osteoporosis posed a risk of future injury and, therefore, the affirmative defense of § 77-1-4.8 applies.[11]

---

[11]    As discussed *infra,* the Americans with Disabilities Act ("ADA") has a similar provision. *See* 29 CFR §§ 1630.2 (r) and 1630.15 (b)(2)]; *see also Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 78 (2002) ("*Eshazabal I*") (upholding 29 CFR § 1630.15 (b)(2)). The state and federal provisions are not identical in every respect, but they both require that, where the employer contends that the employee posed a risk to his health and safety or to that of others, the medical opinions must be based "an individualized assessment" which, in turn, is based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." They also both consider the same four criteria found at § 77-1-4.8.1-4.

A risk to health and safety resulting from a perceived or actual disability may be a lawful reason for discharging an employee, but only if the medical opinions on which the decision relies comply with the requirements of § 77-1-4.8. This is clear from the Legislative Rule itself. It applies where an employee is denied employment because she presents "a materially enhanced risk of substantial harm to the health or safety of the individual or others . . .." In such cases, including the present case, the employer's determination that an individual poses a "direct threat" shall be ***based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.*** This assessment shall be based on a ***reasonable medical judgement that relies on the most current medical knowledge and/or on the best available objective evidence.*** In determining whether an individual would pose a direct threat, factors to be considered include:

> 4.8.1. The duration of the risk;
> 4.8.2. The nature and severity of the potential harm;
> 4.8.3. The likelihood that the potential harm will occur; and
> 4.8.4. The imminence of the potential harm.

*Id.* (emphasis added). The State Rule is an affirmative defense that must be proven by the employer where the discharge is based upon risk to the employee's health or safety.[12] *Id.* ("In deciding whether an individual poses a direct threat to health and safety, ***the employer has the burden of demonstrating*** that a reasonable probability of a materially enhanced risk of substantial harm to the health or safety of the

---

[12] Note: § 77-1-4.8 clearly places the burden of establishing the defense on the employer. However, the federal courts are divided as to which party has the burden of proof in a direct threat case under the ADA *See, e.g., Branham v. Snow*, 392 F.3d 896, 906 n.5 (7th Cir. 2004)

14

individual or others cannot be eliminated or reduced by reasonable accommodation." (emphasis added)). The Supreme Court of Appeals of West Virginia ("WVSCA") has also stated that "the employer must establish that it relied upon ***competent medical advice*** that there exists a reasonably probable risk of serious harm." *Stone v. St. Joseph's Hosp.*, 208 W. Va. 91, 99 (2000). The provision protects employees by requiring that a "direct threat" discharge be based upon a "reasonable medical judgement that relies on the most current medical knowledge and/or on the best available objective evidence," not stereotyping or the opinions of doctors who are wholly ignorant of the "most current medical knowledge."

Thus, the district court's conclusion that reliance on medical opinions immunized CCC from its burden of proof under § 77-1-4.8 is mistaken. The opinions of those doctors still meet the test of the Legislative Rule. Had the court properly engaged in the necessary analysis, it should have concluded that there are genuine issues of material fact as to whether the Steinman, Sethi and Ripepi opinions satisfy CCC's burden under § 77-1-4.8 and denied summary judgment. As discussed *infra,* there are also genuine issues of material fact as to whether CCC acted in good faith in challenging Anderson's return and selecting those doctors.

### B. Anderson presented evidence from well-qualified osteoporosis experts that Anderson should have been allowed to return to work

Anderson demonstrated genuine issues of material fact with regard to § 77-1-4.8 by presenting evidence from Dr. Bellantoni and Dr. Kafka (the only two doctors in the case who are actually specialists in osteoporosis), from Dr. McKinley and from

15

depositions and exhibits which demonstrate good reasons to question whether the medical opinions upon which CCC relies satisfy the criteria of § 77-1-4.8.[13]

Dr. Bellantoni opined that Anderson's risk of a future fracture did not justify denying Anderson an opportunity to return to coal mine employment.  JA0700-703. She explained that "using these risks [Anderson's level of risk] to significantly restrict physical activity would result in a large number of individuals denied access to meaningful employment for the prevention of a small number of fractures." *Id.* Her opinion was based on the most current medical knowledge and on her individualized assessment of Anderson.[14]   JA0700-704.   Dr. Bellantoni is well qualified to offer an opinion on this issue.  She founded the Metabolic Bone Center at Johns Hopkins and is now Clinical Director of the Division of Geriatric Medicine at Johns Hopkins.  JA0319; *see also* JA0705-722 (Bellantoni's C.V.).

Dr. Kafka, Anderson's current treating physician for her osteoporosis, also concluded that Anderson should have been allowed to return to work and that the risk of fracture was not high enough to justify denying her coal mine employment. JA0763-766 (explaining why Anderson is different from other patients with similar

---

[13]    Despite its resources, CCC has not produced a single osteoporosis expert to support of its claim that Anderson's risk of fracture justified its refusal to allow her to return to work.  Its trial expert, Dr. Tucker, is an orthopedic surgeon who has treated patients with osteoporosis for fractures, but does not treat patients for their osteoporosis.  JA0666.  Neither Dr. Steinman, Dr. Sethi nor Dr. Ripepi profess to specialize in osteoporosis and their testimony, discussed *infra,* demonstrates that they lack any such expertise.

[14]    An individualized assessment refers to an evaluation of the particularized factors relevant to the individual such as age, whether she is undergoing treatment, physical strength, *etc*.  JA0701-702 (noting that Anderson is "physically active," "has no limitation on her function," had begun treatment for osteoporosis and is age 52).

T-scores).  Like Dr. Bellantoni, Dr. Kafka, regularly provides care to osteoporosis patients.  JA0754-0755 ("I get many referrals from all over the state for osteoporosis . . ..").  She based her opinions on "current medical knowledge."[15]  JA0628; JA0632-634; JA0754-755.

Dr. McKinley, the orthopedic surgeon who treated Anderson for her fractures, released her to return to work without restrictions.  JA-S1668 ("ready for work resumption without limitation"); JA0218; JA0252 (confirming she had no trouble recommending that Anderson be allowed to return to work).  Dr. McKinley recognized that osteoporosis carries a risk of fracture, but explained that the risk did not mean that a patient had to stop engaging in physical activity.[16]  JA0250.

Anderson's expert medical evidence, standing alone, demonstrates that there are genuine issues of material fact concerning "[t]he nature and severity of the potential harm," "[t]he likelihood that the potential harm will occur" and "[t]he imminence of the potential harm."  Regarding the potential severity of harm, even

---

[15]    Unlike CCC's current expert, Dr. Tucker, neither Dr. Bellantoni nor Dr. Kafka market themselves as expert witnesses. JA0312-315 (stating she has only testified a few times and two of those times as a treating physician); JA0614 (stating she had never been an expert witness before).  Dr. Tucker provides expert testimony through his own company.  His charge is $2,600 for a 90 minute deposition and $435 per every fifteen minutes thereafter.  JA0871.

[16]    Wells Fargo, on behalf of CCC, asked Dr. McKinley to comment on Dr. Steinman's report.  In addressing Steinman's risk predictions, McKinley's stated "[c]ommon sense may suggest that Ms. Lopez would be unwise to return for a risk-benefit perspective as a lifestyle choice . . .."  JA-S 1262.  However, Dr. McKinley made it clear that "there is no evidence based data to reflect her risk to herself or others upon return to the workplace."  *Id.*  At her deposition, Dr. McKinley explained that the fact that osteoporosis creates a risk of fracture does not mean that a person with that risk must stop engaging in physical activity.  JA0250.

17

Dr. Steinman concluded that Anderson did not represent a danger to others and that, at worst, Anderson might suffer a non-fatal fracture at some unknown point in the future.[17]

Neither Dr. Bellantoni nor Dr. Kafka concluded that another fracture was imminent or that its likelihood was such that Anderson should not be allowed to return to her job. JA0763-764; JA0765 (differentiating the risk to Anderson from the risk to an older person with the same T-score); JA0766-0767; JA0700-0704. Moreover, as discussed *infra,* Dr. Steinman admitted that his original opinion as to the likelihood and imminence of another fracture was wrong because he had misunderstood the very study upon which he relied in making his erroneous prediction.

The evidence from Drs. Bellantoni, Kafka and McKinley, standing alone, raises genuine issues of material fact regarding the actual level of risk posed by Anderson's osteoporosis, the credibility of the medical opinions upon which CCC relied and whether CCC complied with § 77-1-4.8. However, as discussed *infra,* this evidence does not stand alone. Other evidence supports the conclusion that CCC did not act

---

[17]  Dr. Steinman admitted that Anderson was not a danger to others. JA0590 ("Q.  Did you give a recommendation that she not be allowed to work because she would present a danger to others in the coal mine? A.  No."); *see also* JA0600. At worst, he thought she might have a nonfatal fracture if she had been allowed to return to her job in the mine. JA0590. ("Q.  And do you have any reason to believe that she would have presented a danger to herself other than a fracture that would be nonfatal? A.  No."). Blevins confirmed that Dr. Steinman's concern was that Anderson might "possibly cause harm to herself if she would return.  JA0393, JA0400.

in good faith in choosing the doctors upon whom it relies and that the opinions of those doctors are not credible.

### C. The district court erred in failing to recognize genuine issues of material fact concerning the competence and credibility of Dr. Steinman's opinions and whether those opinions complied with § 77-1-4.8

Anderson's evidence demonstrated that Steinman's report failed to meet the criteria of § 77-1-4.8 and, further, was neither competent nor credible. This result was not surprising since CCC knew, or should have known, that, in selecting Steinman, it chose a doctor with little or no expertise in the relevant field.

When Blevins decided to require a return to work evaluation, she certainly knew the importance of choosing a doctor with expertise in the medical condition to be evaluated. Blevins was a trained nurse who was active in the medical community and who oversaw Wells Fargo's administration of CCC's workers' compensation programs. JA0451-0452 (stating she is a nurse who reads medical literature). JA420 (stating she has been active in the medical community and knows doctors at area hospitals including Pitt and WVU). Yet, Blevins chose to send Anderson to Dr. Steinman, a doctor who, as discussed *infra*, did not treat osteoporosis patients and had no expertise in the field. In choosing Steinman, Blevins did not select a physician with the "most current medical knowledge" as required by § 77-1-4.8.

Moreover, in choosing Steinman, Blevins deviated from CCC's usual practice. Normally, in serious matters, CCC relies, as one would expect, on experts in the medical speciality that deals with the relevant issue. JA0476-77 (stating that, in the more severe claims, CCC, not Wells Fargo, recommends the physician whom it wants

19

to do the evaluation); JA0480-0481(stating that CCC usually chooses a neurologist or orthopedic surgeon for back fusions, or a WVU specialty group for amputations and that the corporate office would direct a medical exam with a specialist in the area relevant to the injury). Yet, in Anderson's case, instead of referring her to someone with the "most current medical knowledge" in the relevant field, Blevins directed Wells Fargo to schedule the evaluation with Steinman, a doctor who had no expertise in osteoporosis and who was not board certified in anything. JA0495; JA0500; JA0512; JA0474. At the time Steinman offered his opinion he had never even treated a patient for osteoporosis. JA0499 (testifying he treated patients for osteoporosis within the last two years, *i.e.*, after his evaluation of Anderson.)

Steinman's opinion did not comply with § 77-1-4.8. He was even ***not*** aware of the "most current medical knowledge" about osteoporosis. JA0506-07 (admitting he did not know the treatments used by experts in osteoporosis and had not tried to find out). He was not familiar with FRAX, the medical database and risk tool developed by the World Health Organization ("WHO") and relied upon by those involved in treating patients for osteoporosis.[18] JA0343-44; JA0347-48(discussing FRAX); JA0647; JA0500-502; JA0571; JA0600-603 (stating "I don't remember seeing FRAX when I looked."). CCC's compensation administrator, Burford, knew nothing about Steinman that would make him "a particularly good person to choose

---

[18] FRAX refers to Fracture Risk Assessment Tool. JA0647. FRAX was generally accepted among those who treated osteoporosis patients at the time Dr. Steinman evaluated Anderson. JA0346-47; JA0349-50; JA0628 (Dr. Kafka stating she started to use FRAX regularly around 2008); JA0647. Even CCC's retained expert, Dr. Tucker, agrees that in the "community of people dealing with osteoporosis, the FRAX is the most commonly used." JA0674.

for an osteoporosis question." JA0482. According to Burford, Wells Fargo did not use Steinman very often because "[i]t took a long time to get his reports back." JA0944. Moreover, although he claimed to be an occupational health doctor, he did not know the relevant standard for making a "direct threat" decision under the HRA or the ADA. JA0516-17.

Steinman was not a reasonable choice for an osteoporosis evaluation, but he did have a regular and ongoing financial relationship with CCC. JA0532. In this role, he made no secret of his belief that individuals with osteoporosis should not work in coal mines. This occurred when Steinman requested a DEXA scan for a woman as part of her CCC new employee physical. Whomever he spoke to told him that he or she could not deny employment to a new employee because she had osteoporosis. In an email to Wells Fargo, Steinman recounted this conversation and explained that he had been told that CONSOL "couldn't prevent someone from working because they had osteoporosis." JA0605. Reacting to this comment, Steinman disclosed his attitude toward employing miners with osteoporosis, noting "I don't really see much difference in telling them [individuals with osteoporosis] that they can't work regardless of when you find out. *Other than of course paying hundreds of thousands of dollars for a [workers' compensation] claim.*" *Id.* (emphasis added). Asked at his deposition to explain what he meant by his email, Steinman replied that "[t]hey [CCC] understand money," JA0593.

When she directed Wells Fargo to schedule Anderson for an evaluation by Steinman, Blevins likely knew Steinman's attitude about miners with osteoporosis. She and Steinman were not strangers. She often called him to discuss medical issues

21

about CCC employees. JA0538-0539; JA0410. Steinman spoke to Blevins often enough that he concluded "[i]t was almost as if I was the Consol medical director without being paid." JA0539. As the person charged with "clinical oversight" of Wells Fargo's workers' compensation work for CCC, it is unlikely that Blevins did not learn Steinman's attitude toward the risk of workers' compensation costs associated with employees with osteoporosis.

Blevins also knew that Steinman had previously evaluated another female coal miner with osteoporosis and advised CCC that the miner should not return to work due to her osteoporosis.[19] JA0197; JA0439-440; JA0450; JA1766-1775; JA1781-1788. And Blevins was likely familiar with Steinman from reviewing his reports and recommendations on CCC coal miners in their compensation claims over several years. When he worked in occupational health at Fairmont General Hospital, Steinman did more work for CCC than for any other company. JA0530. In 2009, the year before Blevins chose him to evaluate Ms. Anderson, Steinman evaluated CCC employees through his own company. Thirty percent (30%) of his company's work was for CCC. JA0532. From these facts, a jury could reasonable infer that Blevins

---

[19]    The other female miner suffered two osteoporosis related injuries. JA1766-1775; JA1781-1788. She returned to work after the first injury and was injured again. JA1767. The fact that one female coal miner suffered two osteoporosis related injuries does not mean that Anderson would have been injured again had she returned to work. Assuming that Anderson would suffer a second injury because Jones did is the kind of stereotyping that is contrary to the laws prohibiting disability discrimination. *Skaggs v. Elk Run Coal Co.*, 198 W. Va. 51, 63 (1996) ("*Skaggs I*") ("the law protects persons with impairments from being denied employment by virtue of an employer's . . . stereotypical assumptions about their capabilities."). A critical factor in assessing the risk of injury is the age of the individual and Jones was older than Anderson. JA0702; JA0764-765. Anderson was 52 at the time. JA-S1172. The other female miner was 62 and 63 at the time of her injuries. JA1766; JA1781.

knew Steinman was someone whose opinions were ***not*** likely to be adverse to CONSOL's interests.[20]

Blevins selected Steinman although she did not know whether he had any expertise in osteoporosis. JA0451. ("Q   So the answer is, no, you don't know if he had any expertise in osteoporosis, true?  A   I have no idea if he had any."). And, when asked if she "inquire[d] if he had any particular expertise in the field of osteoporosis back in 2010 or at any other time," she responded "no." *Id.* Thus, when Blevins turned to Steinman, rather than someone with osteoporosis knowledge and expertise, she made a conscious decision to choose a doctor whose medical opinions were unlikely to meet the requirements of § 77-1-4.8, but who would probably be sensitive to the interests of CCC.

Steinman's evaluation of Anderson confirmed that his knowledge of osteoporosis was not only limited and superficial, but also, in critical respects, his opinion was not even competent.  Steinman relied on Google, not a medical database, to research osteoporosis.  JA0491.  As noted *supra*, he was unfamiliar with FRAX even though it was generally accepted among those who treated osteoporosis patients at the time he evaluated Anderson.  He did not even bother to consult with any

---

[20]    Anderson does not suggest that there is something wrong, *per se*, with regularly working as one of CCC's compensation evaluators.  However, working on evaluations for CCC does not make one an osteoporosis expert, but it does support an inference that CCC, in continuing to assign cases to Steinman, most probably found his evaluations consistent with its interests.  Steinman's financial relationship with CCC could also support, on this record, an inference that he had a bias in favor of CCC.

specialists in osteoporosis to ensure he had relied on current medical knowledge. JA0499.

Unfamiliar with the latest knowledge in the field, Dr. Steinman relied on a study he found through Google which he believed predicted that, more likely than not, Ms. Anderson would suffer another fracture within 2 years of returning to work:

> Q.   In other words, this individual, Joyce Anderson, under the FRISK study, has a 50 – more than 50 percent probability that she will have a fracture within two years?
> A.   Yes.
> Q.   You believe that -- you really believe that's what the article says?
> A.   That's what I believed at the time.

JA0568; *see also* JA0490-92; JA0541.  Yet, at his deposition, when questioned by Anderson's counsel, Steinman admitted he had completely misunderstood the study. The study, *Fracture Risk (FRISK) Score: Geelong Osteoporosis Study* ("Henry Study"), did not represent the most current medical knowledge in osteoporosis. JA0647-JA0662 (information from the International Osteoporosis Foundation); JA0702 (discussing problems with the Henry Study); JA0751-53 (explaining problems with Henry's FRISK analysis).  *Most important, Steinman's reliance on the Henry Study for his conclusion that Anderson would had a 50% probability of suffering another fracture within two years was totally wrong.*

First, although he intended to cite the Henry Study in his report, Steinman mistakenly cited to a letter to a medical journal instead of to the Henry Study itself. Ironically, the letter ("Gorricho letter") cautioned readers about the danger of misusing the Henry Study to predict the likelihood of an individual getting a fracture because "the positive predictive value after 2 years is just 10% (only one in 10 people

at high risk would have a fracture).”). JA0768. The letter added “[w]e would like to under-line that whenever this fracture score is used in a low-prevalence population, too many false-positive results will be found.” *Id.* Thus, although Steinman cited and relied on the Gorricho letter, he apparently never read it because, had he done so, he would have realized that his prediction of Anderson’s fracture risk was totally wrong.

Second, the journal that published Gorricho’s letter included a comment from the Henry Study authors responding to Gorricho and acknowledging the limited predictive value of their FRISK score. JA0768. (“We agree that the low prevalence of fracture does considerably reduce the positive predictive value of the fracture risk score.”).

Third, confronted at his deposition with the Henry Study and the Gorricho letter, Steinman admitted that, although he relied on the Henry Study, it did ***not*** actually support his prediction that Anderson would likely suffer another fracture in 2 years. Instead, he agreed that the study actually supported a 90% probability that she would ***not*** have a new fracture in two years. JA0581-85.

Moreover, unlike FRAX, the Henry Study was based on data for individuals who were “sixty years of age or older.” JA-S1165. Dr. Bellantoni explained that as a result of the ages of the study participants, the study was not helpful in predicting anything about Anderson who was 52 at the critical time period. JA0338 (for younger adults “there is such a low predictive value of the FRISK that it is not clinically meaningful.”); JA0702 (the study “cannot be assumed to apply to a much younger and physically fit woman like Ms. Anderson whose initial fracture resulted

25

from a fall onto concrete."). Dr. Steinman, on the other hand, did not even know the age of the participants in the Henry Study.[21] JA0570.

Steinman also failed to conduct an "individualized assessment." Instead, he relied on a generic statement of the risk level from the bone density scan report. That report, based solely upon Anderson's T-score ( a measure of bone density relative to healthy young adults), stated that "[f]racture risk is high." JA-S 1080. However, Steinman did not understand that relying on the generic statement of risk on the bone density report violates the individualized assessment requirement of § 77-1-4.8. Unlike Dr. Steinman (and Dr. Sethi), a doctor with expertise in osteoporosis would understand that the T-Score and the generic risk assessment in the report must be reviewed in light of the specific characteristics of the individual patient, *i.e.* an individualized assessment. As Kafka explained, the T-score must be interpreted by someone with knowledge of the field:

> This is not the only case in medicine where the number itself is to dictate treatment or -- or to -- or to make a prediction. There are other examples all through medicine where a number itself is not enough. And you have to have an expert. That's why we have cardiologists. That's why we have other specialists, because you cannot just look at this [DEXA scan] number.

JA0624-25. Osteoporosis practitioners understand that one cannot reach conclusions about fracture risk from the T-scores alone. Rather, it is important to conduct an

---

[21] Also, as noted in Henry's response to the Gorricho letter, the data in the Henry Study was used to determine which patients needed treatment, not to predict who would actually have another fracture within a two year period. JA0768. ("The very high negative predictive value derived in our study will ensure that those who do not require therapy are not unnecessarily medicated.").

individualized assessment of the patient because age, among other factors, makes a difference in the person's risk level:

> So age is very, very important. Age – the FRAX has a very heavy component based on age, for that reason, that as -- as people age and don't have treatment of osteoporosis, their -- their bones, really, are very, very thin in multiple aspects. Not only from within the bone but from outside the bone. And that makes them at very great risk. So a 52-year-old is very different than an 82-year-old even with the same T-score.

> And so, again, even though it appears as though her T-score is very, very, very low or that -- you know, low to the risk that the -- that the WHO says on there, that she is high fractured -- a high fracture risk, that risk would be very different in an 82-year-older versus a 52-year-old even though they have the exact same T-scores.

JA0764-765. Dr. Bellantoni agreed explaining that "[a] young woman who is functionally intact with no limitation has a far lower risk of recurrent fractures than an older woman with functional impairment." JA0339. Bellantoni also explained "bone density data, FRAX assessment, or other fracture-risk calculation tools are not sufficient to make reasonable medical recommendations on physical activity. The appropriate assessment for physical recommendations requires an assessment of muscle strength, posture, and body mechanics." JA0701. Moreover, risk predictions are generally based on patients who are untreated since treatment reduces the risk of fracture. *Id.* Anderson had, at the relevant time period, resumed treatment. JA062-662.

Thus, there are genuine issues of material fact as to whether Steinman's opinion was based on an "individualized assessment," whether it constitutes a "reasonable medical judgement relying on the most current medical knowledge,

27

and/or on the best available objective evidence," whether it was "competent medical advice" and whether it otherwise complies with § 77-1-4.8.

### D. The reports of Dr. Sethi or Dr. Ripepi also raise genuine issues of material fact

The reports of Drs. Sethi and Ripepi do not alter the conclusion that CCC's direct threat defense raises genuine issues of material fact. To the contrary, the medical reports represent additional evidence of contested facts and demonstrate that the other doctors CCC relies upon were no more aware of the "most current medical knowledge" than Dr. Steinman and that they actually incorporated his errors in their opinions. Dr. Ripepi, who, like Steinman, was chosen by Blevins, did what he called a "chart review" of Steinman's opinion without reviewing any studies himself. JA0772-74; JA0472 (explaining that Blevins instructed her to schedule an evaluation with Dr. Ripepi). Ripepi concurred with Steinman's opinion that Anderson would likely sustain a fracture within two years based on the Henry Study even though he never read the study. JA0772-76. Ripepi had never heard of FRAX or the FRAX literature. JA0770-71. He was not familiar with what WHO relied on to predict a fracture risk. JA0771-72. Nonetheless, even though he had never read the Henry Study, Dr. Ripepi relied, in rendering his opinion, on Steinman's conclusion that it was more probable than not that Anderson would have a fracture in the next two years. JA0781. When counsel for Anderson tried to get Dr. Ripepi to review the Henry Study to see if it actually said what he thought it said, CCC's counsel objected and Ripepi's counsel would not allow Dr. Ripepi to answer. JA0777-79.

28

Blevins, who most probably knew or knew of Sethi from his workers' compensation evaluations for CCC told mine HR manager Layton that she thought Sethi's name should be included in the names submitted for the third doctor in the III(j) procedure.[22] Like Steinman, Sethi does not have any expertise in osteoporosis.[23] JA0803. Sethi's primary qualification appears to have been his relationship with CCC as one of its reliable workers' compensation evaluators. JA0785-788 (CCC records which include Dr. Sethi's work for CCC). Sethi had been evaluating coal miners for "more than ten years." JA0795. Yet, when questioned as to whether he had ever been asked to do an evaluation by a coal miner or his representative, as opposed to an insurance company or an employer, Dr. Sethi responded "[w]ell, generally speaking, no. No doctor gets asked that." *Id.* He had never heard of the FRAX standard from WHO. JA0814. When asked whether he knew anything about FRAX, he responded "I don't remember right now." *Id.* Sethi incorporated Steinman's reference to the Henry Study, but must not have read it because he adopted Steinman's mistaken reference to the Gorricho letter as if it were the Henry Study. JA0804-0805; JA-S1417 (Sethi Report erroneously referencing "a fracture

---

[22]  CCC may contend that Blevins did not chose Sethi. However, CCC needed to submit the names of doctors it wanted to evaluate Anderson under the III(j) procedure. Another CCC nurse suggested two orthopedic surgeons, but Blevins overruled her and substituted, among others, Dr. Sethi. JA0782; JA0783.

[23]  Sethi is Board Certified in Occupational Medicine, but does not have any expertise in osteoporosis. JA0803-804; JA0814. CCC is likely to argue that Sethi was qualified to evaluate Anderson because he is a occupational health specialist. However, that argument only demonstrates that there are disputed issues of material fact. Moreover, the critical medical opinion, the risk of a future fracture, requires knowledge about osteoporosis that Sethi lacks.

risk developed by Dr. J Gorricho"). When asked if he had checked Dr. Steinman's reference to the "study," Dr. Sethi responded that "I don't know - - I do not need to check anything." JA0810-0811; *see also* JA0819 ("Q. So I take it, Doctor, you did not read that article before I just gave it to you tonight? A. No."). At one point Sethi stated that a question was vague because "I don't know what you mean by coal miners." JA0800. In explaining why Ms. Anderson should not work in a coal mine, he claimed that "[t]he mining environment is unstable. Things are shifting all the time. The wall is shifting, the things are shifting." JA0823. A jury could fairly question Sethi's credibility based on his deposition testimony.[24]

Taking the facts and inferences in the light most favorable to Anderson, she has presented sufficient evidence to support a finding that CCC failed to meet its burden under § 77-1-4.8 when it discharged Anderson for allegedly presenting an unacceptable fracture risk. Moreover, applying *Stone v. St. Joseph's Hosp.*, 208 W. Va. at 99, Anderson has presented evidence which, if credited by the jury, demonstrates that CCC did not rely "upon **competent** medical advice."

### E. Conclusion

As noted *supra,* the district court erred because it failed to address the relevant "direct threat" analysis. Although the court briefly mentioned "direct threat" in its decision (JA1041), it abandoned any further discussion of § 77-1-4.8 and therefore never engaged in the § 77-1-4.8 analysis. The court also erred when it wrote:

---

[24] One cannot fully appreciate why Anderson questions Sethi's credibility without watching his deposition. A DVD of the deposition synchronized to the transcript was submitted to the district court and is included in Volume VII of the Appendix. The Court is encouraged to view it.

> in compliance with the CBA, the defendant and plaintiff received three medical opinions regarding the plaintiff's ability to return to work. Of those three opinions, two of the opinions advised the parties that the plaintiff should not return to work. Relying on these medical opinions, and not simply the plaintiff's status as "disabled" or her gender, the defendant terminated her employment.

JA1044. The district court apparently reasoned that compliance with the CBA ended the discussion of whether there were genuine issues of material fact under § 77-1-4-8. In doing so, the court committed reversible error.

### III.    There are genuine issues of material fact as to whether CCC acted in good faith

CCC's good faith in relying on medical opinions from Steinman, Ripepi and/or Sethi is not the test under § 77-1-4.8, but, even if it were, CCC's defense would fail. First, CCC chose doctors who lacked expertise in osteoporosis when it knew or should have known that § 77-1-4.8 required opinions from doctors who could provide reasonable and competent advice based on the most current medical knowledge.[25] Had CCC wanted, in good faith, a reliable medical opinion regarding Anderson's risk of an osteoporotic fracture, it would have turned to doctors who had expertise in osteoporosis. Its decision to chose Drs. Steinman and Sethi for the III(j) process supports an inference that CCC was not engaged in a good faith attempt to obtain opinions from doctors who were likely to make an objective, informed assessment of the actual risk. The inference is further supported by evidence that CCC chose doctors whom it knew from their ongoing relationship with CCC and who were likely to be sensitive to CCC's interests if not actually biased in CCC's favor. And, most

---

[25]    In 2010, Blevins apparently was at least generally aware that there were federal and state laws dealing with the "direct threat" issue. JA0389.

important, this choice was made by CCC's Manager of Occupational and Nonoccupational Healthcare, a responsible CCC official who was trained as a nurse and who certainly knew the importance of choosing doctors with some expertise in the relevant field if one wants reliable medical opinions.

Nonetheless, the district court rejected Anderson's contentions concerning CCC's failure to seek opinions from doctors with some expertise in osteoporosis concluding that the "specialty-level of the doctors . . . is not a germane issue to the law at issue here."  JA1044-45.  This was error.  Section 77-1-4.8 ensures that individuals are not deprived of the opportunity to work based on unreliable medical evidence.  The law requires that CCC rely on competent medical advice and on doctors with the most current medical knowledge.  CCC is expected to know what the law requires and, contrary to the district court's conclusions, the "specialty-level" is certainly "a germane issue to the law at issue here."  The EEOC has recognized this fact in interpreting the similar ADA provision.  EEOC's guidance to employers under the ADA provision states "[t]he health care professional the employer chooses [to examine the employee] should have expertise in the employee's specific medical condition. . . ."[26]  Neither Steinman, Ripepi nor Sethi meet that standard; Bellantoni and Kafka clearly do.[27]

---

[26]    *Questions and Answers: Enforcement Guidance on Disability-related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA)*, http://www.eeoc.gov/policy/docs/qanda-inquiries.html.

[27]    Dr. McKinley also has the requisite expertise.  JA0244-248.

32

Second, in *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023 (9th Cir. 2002) ("*Eshazabal II*"), on remand from the U.S. Supreme Court, the Court of Appeals analyzed the various medical opinions of doctors who offered conflicting medical opinions in an ADA "direct threat" case. In reversing a decision granting summary judgment to the employer, the Court considered the relative expertise of the doctors relied upon by the employer and employee:

> Neither Dr. Baily nor Dr. McGill has any special training in liver disease. Baily's area of medical expertise is in preventive medicine, while McGill is a generalist, with no board certification in any specialty. In contrast, Echazabal's experts, Dr. Fedoruk and Dr. Gitnick, are specialists in toxicology and liver disease.

336 F.3d at 1029; *see also* 336 F.3d at 1032 ("neither of the Chevron [employer] doctors had expertise in this area [liver diseases]."). Contrary to the district court's conclusion, expertise does matter in a "direct threat" analysis.

Thus, the opinions of Drs. Steinman, Sethi and Ripepi are not entitled to a rubber stamp in a § 77-1-4.8 case. A court can and should consider the relative expertise of doctors in evaluating medical opinions. *Echazabal II* explained that evidence from experts should be considered because it "elucidates the very issue the court must assess -- whether the opinion that a direct threat existed was objectively reasonable." 336 F.3d at 1033 (relying on *Bragdon v. Abbott*, 524 U.S. 624 (1998)). The opinions of the experts in *Echazabal II* "were directed in significant part to the state of medical knowledge -- the best available objective evidence -- at the time of Chevron's employment action. At the very least, they were highly relevant to that

question." 336 F.3d at 1033. The opinions of Bellantoni, Kafka and McKinley should be similarly recognized in this case.

Further, *Echazabal II* weighed the conflicting medical opinions to determine, as Anderson argued in the present case, whether the opinions upon which the employer relied were "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 336 F.3d at 1028 (quoting 29 C.F.R. § 1630.2(r)). The district court in this case should also have also evaluated the medical opinions to determine if "there is an issue of material fact whether the medical judgments which formed the basis of Chevron's [the employer's] assessment were based on 'the most current medical knowledge and/or the best available objective evidence'. . . ." 363 F.3d at 1033 (quoting 29 C.F.R. § 1630.2(r)); *see also* 363 F. 3d at 103401035 ("we must decide only whether Echazabal has raised a material question of fact as to whether Chevron has met its burden under § 1630.2(r)").

Finally, *Echazabal II* concluded that the issue was "whether the opinion that a direct threat existed was objectively reasonable." 336 F.3d at 1033. The evidence discussed *supra* demonstrates that there are genuine issues of material fact in the present case as to whether the Steinman, Sethi and Ripepi medical opinions met that test.

### A.    The District Court erred in ruling for CCC based on the CBA

The court erred when it equated CCC's obligation under the CBA with its obligation under state law:

34

> the terms of the CBA do not require the evaluating doctors be specialists in their field. Thus, the argument that the evaluating doctors did not practice in any medical speciality or possess any particular certification relating to osteoporosis is not relevant in this civil action, as such was not required under the CBA.

JA1045. The specialty of each doctor may not have been an issue under the CBA, but, as discussed *supra*, it is an issue under § 77-1-4.8. The fact that the CBA did not require a specialist is irrelevant to a decision under § 77-1-4.8 and the arbitrator did not decide whether CCC complied with § 77-1-4.8. This case is not one where the Arbitrator had the authority, under the CBA, to decide state law issues. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 251 (2009). Moreover, the arbitrator upheld the discharge because "two of the three examining physicians [Steinman and Sethi] have rendered opinions that comply directly with the decision of the Review Board in Decision 78-39."[28] JA0854. The arbitrator neither evaluated those medical opinions nor ruled on any questions of state law.[29]

---

[28]    The Ripepi opinion was not part of the III(j) proceeding.

[29]    The Arbitrator, quoting from another arbitrator, recognized that rights and even words, such as disability, can have one meaning under a CBA and a quite different meaning under state law:

> Disability under the terms and meanings of the contract is for an arbitrator to resolve. Disability under the terms and meanings of the workers' compensation law is for the appointed administrative agencies to determine. Each has their own separate set of rules. Each has their own separate set of resolution and each has their own meanings and functions without the intervention of the other. There may be a ruling in one contrary to the terms and meanings of the other. So be it. It does not follow that one has to be compatible to the other. They arise under different sets of rules and are heard under different rules of evidence. It is quite true that they may be incompatible with each other.

JA0866 (internal quotations omitted). Whatever the merits of the arbitrator's

When CCC told Wells Fargo to arrange an evaluation by Steinman, CCC had a duty to ensure that the evaluation complied with § 77-1-4.8, not just with the CBA. The fact that the CBA did not require the evaluators to base their opinions on the "most current medical knowledge," to provide "competent medical advice" or to conduct an "individualized assessment" does not relieve CCC of its state law duty to comply with § 77-1-4.8.

Both CCC and the arbitrator understood that the arbitration did not decide Anderson's rights under state law. In its Opening Statement to the arbitrator, CCC recognized the difference between a CBA arbitration and state law:

> To the extent the Union argues that Management's actions violated the West Virginia Code, ***Management will contend that the arbitration forum is not the proper forum to advance those arguments, that the Arbitrator' authority is limited to interpreting the provisions of the Wage Agreement***, and that the Arbitrator does not have authority to interpret external law.

JA0832 (emphasis added). CCC's Closing Statement reiterated the same point:

> the Arbitrator's authority is limited to determining whether or not Management violated the Wage Agreement. ***Questions concerning compliance with the West Virginia Code are to be resolved by the appropriate administrative agencies or courts.***

JA0838 (emphasis added); *see also id.* at JA0845 ("To the extent the Union argues that the West Virginia Code affords Grievant Lopez a remedy, Management contends that the Arbitrator has no authority to grant such remedy; rather, the claim must be addressed to the appropriate administrative or judicial forum.").

The Arbitrator agreed with CCC:

---

determination under the CBA, it is not binding on the application of § 77-1-4.8.

> The Arbitrator does not have authority or jurisdiction to consider or rule upon whether or not the Employer violated any provision of the West Virginia Workers' Compensation Act or any other external laws in refusing to allow Grievant Joyce Lopez to return to work and in terminating her employment.

JA0869.

Thus, although the speciality of a doctor may not be relevant to the III(j) analysis under the CBA, that fact is not dispositive of the appropriate analysis under state law which involves entirely different legal requirements and, as a result, the arbitration opinion does not justify CCC's failure to comply with § 77-1-4.8.

**B. The District Court erred in granting summary judgment on Anderson's disability discrimination claim where the Consolidation Coal Company because it failed to consider substantial portions of the evidence submitted in support of Anderson's opposition to summary judgment and because it resolved disputed facts against her.**

In addition to the errors in construing the record discussed *supra*, the court erred in rejecting, as a matter of law, Anderson's evidence and inferences that the "the medical opinions used and the process of the examinations of the plaintiff were suspicious" and that "the doctors used were 'company doctors,' or those selected to provided favorable opinions for the defendant." JA1044. Although Anderson presented evidence that supported the conclusion rejected by the district court, the court resolved that evidence against Anderson concluding that "insufficient evidence has been offered to support these claims, and they are speculation at best." *Id.* Yet, as discussed *supra,* the medical opinions and the manner in which CCC chose the doctor evaluators were more than suspicious. Choosing doctors who know little or nothing about the medical condition at issue, particularly when CCC normally does

37

turn to doctors with expertise in the appropriate field, is certainly "suspicious" and the fact that CCC chose doctors that do not meet the requirements of § 77-1-4.8 is not "speculation."  Nor is it speculation to question Blevins' good faith in the process given the facts and inferences discussed *supra*, and given her disingenuous denial that she,  rather than Wells Fargo, chose Dr. Steinman and Dr. Sethi.  JA0378; JA0448; JA0468; JA0472.  Likewise, the evidence that CCC's medical opinions were not based on current medical knowledge and that Steinman and others dramatically misconstrued the very article on which Steinman relied is neither "insufficient" nor "speculation."  Finally, the evidence that Steinman and Sethi were akin to "company doctors" was real, not speculative, as it was based on evidence of their financial relationship with CCC, on Steinman's admitted role as Blevins informal medical director, on Steinman's strong opinions about the financial risk posed by miners with osteoporosis  and on Sethi's lack of information about osteoporosis and often bizarre comments at his deposition.

The district court also erred in resolving disputed facts in CCC's favor when it concluded "[t]he facts show that the defendant acted under an honest belief regarding whether to discharge the plaintiff, basing the decision on the recommendations by licensed physicians with experience, though technically not specialities, in osteoporosis." JA1045.  Again, the court erred for two reasons.  First, as discussed *supra,* the evidence and inferences are sufficient to allow a reasonable juror to conclude that CCC did not act in good faith in the process, including in its choice of doctors.  Second, the conclusion ignores § 77-1-4.8 under which CCC had a duty to make sure its decision was based on the opinions of doctors knowledgeable about

38

osteoporosis.  CCC had a right under the III(j) process to chose those doctors, but that did not insulate CCC's choices from an analysis under § 77-1-4.8.  It is unreasonable to interpret the Rule such that CCC can evade it by choosing doctors who lack the necessary expertise to provide the reliable opinions that the Rule requires.

The court's analysis seems to imply that relying on medical opinions that fall far short of the requirements of § 77-1-4.8 are nonetheless a defense.[30]  This approach effectively eviscerates the State Legislative Rule because it allows CCC to rely on medical opinions that do not meet any of the requirements of § 77-1-8.4, and it does so even though CCC could have avoided the problem by choosing doctors who actually possessed the relevant medical knowledge.

The court also erred when it concluded that "[b]oth parties together selected the third physician."  JA1045.  This statement accepts CCC's mistaken representation that the plaintiff herself agreed to be examined by Dr. Sethi.  Anderson, however, never chose Sethi in the manner suggested by the district court.  Dr. Sethi was chosen through the III(j) process from names provided by the union and CCC.  Dr. Sethi's name was submitted by CCC, not by the union.  JA0783.  The parties struck some of the names and then Anderson had to pick one of the two remaining names out of a hat.  JA0097.  The first name out of the hat was Dr. Kafka who was not, at the time, treating Anderson.  JA-S1339; JA0097-0100.  Kafka's office, however, apparently thought this

---

[30]  Decisions under the ADA have concluded that a good faith belief that an individual poses an unacceptable risk is not a defense unless it meets the requirements of 29 C.F.R. § 1630.2 (r).  *See, e.g., Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1306 (11th Cir. 2001) (rejecting the employer's reliance on the company physician's opinion).

39

was a workers compensation case and, since her office does not take such case, her office declined to get involved. JA0099-0101; JA0640-0641. That left Sethi as the only remaining doctor submitted by either party. JA-S1599-1560. Anderson acknowledged that this procedure led to Sethi's selection, but that does not mean he was her choice. Nor did she ever agree that Sethi would fairly evaluate her. JA0101-0102.

The court concludes its analysis by stating that CCC had a legitimate non-discriminatory reason for discharging Anderson and that Anderson "offers little evidence to prove pretext. . . ." JA1046. However, the issue in this case is not traditional pretext; the issue is whether there are genuine issues of material fact as to whether the discharge complied with § 77-1-4.8. "Direct threat" is a legitimate non-discriminatory reason to deny employment to a miner, but only if the basis for asserting "direct threat" complies with the requirements of § 77-4-8 and *Stone v. St. Joseph's Hosp.,* 208 W. Va. 91 (2000). Stated another way, Anderson does not need to prove pretext, *i.e.*, that CCC had a motive other than its alleged concern that Anderson posed a risk to her health and safety. She is only required to prove that CCC's decision failed to comply with the law, *i.e.*, was not based on "competent medical advice," on the "most current medical knowledge" and/or on the required "individualized assessment." On these issue, there are genuine issues of material fact that must be resolved by a jury.

Finally, even if proof of pretext were required, the court never properly analyzed the issue because it mistakenly concluded:

the plaintiff argues that (1) defendant is self-insured, meaning it acted discriminatory in an effort to save money and in the process generally by manipulating it through self-interest and (2) that focusing on workers' compensation costs serves as a pretext for the discrimination. However, this argument fails to satisfy the standard to show pretext, which requires creating an inference through either direct or indirect evidence of falsity or discrimination.

*Id.* The court, however, is wrong. First, Anderson does not contend that CCC's self-insured status is the basis for her claim that CCC violated § 77-1-4.8. Second, to the extent there is an issue of pretext in her § 77-1-4.8 claim, pretext is found in CCC's disingenuous explanations for its choice of doctors.[31]

**IV. The District Court erred in granting summary judgment on Anderson's claim that her workers' compensation claim was a significant factor in the decision to terminate her employment because it failed to consider substantial portions of the evidence she submitted in opposition to summary judgment and because it resolved disputed facts against her.**

To establish a prima facie case of workers' compensation retaliation, Anderson must proffer evidence that (a) she sustained an "on-the-job" injury, (b) she instituted proceedings under the WCA and (c) her workers' compensation claim was a "significant factor" in the decision to discharge her. *See, e.g.,* Syl. Pt. 1, *Powell v. Wyoming Cablevision, Inc.*, 184 W. Va. 700 (1991). The court agreed that Anderson had an on-the-job injury and that she filed a claim under the Workers' Compensation Act. The only issue was whether the evidence supports an inference that the filing of Anderson's workers' compensation claim was a significant factor in her discharge

---

[31] CCC claims it chose occupational health doctors, but the issue does not primarily involve an occupational health question. Rather, it involves an understanding of the current medical knowledge about osteoporosis and the risk of fracture.

41

under a pretext or mixed motive analysis.[32]  In concluding that Anderson failed to proffer that evidence, the court erred because it misconstrued both the facts and the law and resolved facts against Anderson.

The district court may have erred, in part, because of its erroneous conclusion that "***circumstantial evidence*** can be used to demonstrate the nexus, but ***cannot itself demonstrate a prima facie case***."  JA1038 (emphasis added).  To the contrary, wrongful discharge cases rely on circumstantial evidence for the prima facie case because direct evidence is usually not available:

> in a case premised on an alleged violation of a statute purposed to counter retaliation or other discrimination, we must keep in mind that those engaged in such conduct rarely broadcast their intentions to the world. Rather, employers who practice retaliation may be expected to seek to avoid detection, and it is hardly to be supposed that they will not try to accomplish their aims by subtle rather than obvious methods. . . .

*Powell v. Wyo. Cablevision*, 184 W. Va. 700, 704 (1991) (quoting *Axel v. Duffy-Mott Co.*, 389 N.E.2d 1075, 1077 (N.Y. 1979)).  In *Nestor v. Bruce Hardwood Floors, L.P.*, 210 W. Va. 692, 695 (2001) (per curiam), a workers' compensation retaliation case, the WVSCA noted:

> "In employment discrimination cases, there is often very little direct evidence of discriminatory intent. This Court has said that because discrimination is essentially an element of the mind, there will probably be very little direct proof available. Direct proof, however, is not required. *What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion.*"

---

[32]  *See* footnote 10 regarding the mixed motive analysis in West Virginia.

210 W. Va. at 695 (quoting *Conaway v. Eastern Associated Coal Corp.*, 178 W. Va. 164, 170-171 (1986)) (emphasis added). *See also, Skaggs I*, 198 W. Va. at 76 (1996) ("Circumstantial evidence can be powerful, and direct evidence limp, and vice versa."). The district court's conclusion about the limited role of circumstantial evidence is mistaken.

The district court also erred in concluding that "plaintiff provides nothing that creates an inference [that a compensation claim was a significant factor in the discharge]." JA1039. Instead of focusing on the facts and inferences upon which Anderson relied, the district court distinguished Anderson's case from *Powell* because CCC acted under the CBA, because the medical opinions supported its decision and because a neutral arbitrator "found no fault in the medical opinions and upheld the doctors' recommendations." JA1039. In doing so, the court mistakenly focused on CCC's final decision and ignored the evidence, discussed *supra*, supporting an inference that CCC's treatment of Ms. Anderson in the III(j) process and, in particular, its choice of friendly, but unqualified, doctors to perform the required evaluations. Moreover, the court's conclusion that the arbitrator "found no fault in the medical opinions" ignores that fact that the arbitrator did not evaluate the medical opinions one way or the other except to determine that they complied with the CBA and that Anderson lost 2 to 1.[33]

---

[33] Plaintiff may establish her *prima facie* case by demonstrating that there was "proximity in time" between the "claim and the firing." *Powell v. Wyoming Cablevision, Inc.*, 184 W. Va. 700, 704 (1991). Ms. Anderson was discharged when she first attempted to return to work following her injury. Thus, "proximity in time" can also support an inference of discrimination and establish a *prima facie* case.

43

The court also failed to consider evidence that CCC's non-discriminatory reason for initiating its challenge to Anderson's return to work was pretextual. CCC's alleged non-discriminatory reason was CCC's concern for the health of Anderson. Blevins testified that "[t]he concern with Mrs. Anderson was that if that would occur it wasn't because it was a safety issue, it was because of the health issue she had that could cause harm to herself." JA0406. There are genuine issues of material fact as to whether this was pretextual. First, CCC's decisions to chose doctors who lacked the relevant expertise is evidence of pretext. An employer who really wants to know if an employee is at significant risk of serious injury turns to a doctor with the appropriate expertise. Certainly, if anyone in CCC management wanted to know his or her personal risk of injury from osteoporosis, he or she would turn to someone with expertise in the disease. In other contexts, that is precisely what CCC does. JA0479-480. In this case, however, as discussed *supra*, Blevins selected doctors who had no expertise in the care or treatment of osteoporosis patients and no real understanding of current medical knowledge in the field.

Second, the court failed to realize its error because it focused on the outcome of the III(j) process rather than the manner in which CCC attempted to and succeeded in using that process to discharge Anderson. The decision to request a second opinion about Ms. Anderson before she could return to work and the subsequent choices of doctors were ***not*** neutral decisions made to seek out the best medical evidence. CCC manager Blevins, given her experience with medical experts in her workers' compensation responsibilities, certainly knew that the choice of a medical expert is not necessarily a neutral decision and her choices were anything but neutral:

44

- Anderson was cleared to return to work by her Board Certified orthopedic surgeon and her physical therapist. Although CCC policy did not require a return to work examination, CCC manager Blevins directed that Anderson be referred for one.

- Blevins consciously chose not to select doctors who actually had the expertise to provide reliable opinions about the risk to Anderson.

- CCC's decisions to select doctors without the requisite expertise were inconsistent with CCC's practice of choosing doctors who did have that expertise and inconsistent with what one would expect from an employer that wants a reliable medical opinion.

- The decisions were made by Ms. Blevins, the Manager of Occupational and Nonoccupational Healthcare, a trained nurse who was active in the medical community and whose job included overseeing Wells Fargo's administration of the CCC workers' compensation program. Ms. Blevins certainly understood the importance of choosing doctors with the appropriate expertise, but choose not to do so in Anderson's case.

- Instead of choosing a doctor with the requisite expertise, Ms. Blevins chose Dr. Steinman who was one of CCC's regular compensation doctors and who relied on CCC for a significant part of his medical practice. When she did so, she knew, more probably than not, of Steinman's belief that individuals with osteoporosis represented a risk of losing "hundreds of thousands of dollars" in workers' compensation costs. JA0605 This inference is supported by her regular working relationship with Steinman who fashioned himself the "CONSOL medical director without being paid" (JA0539) and by her knowledge that he had previously recommended that another woman with osteoporosis not be allowed to return to coal mining.

- When it was time to recommend other doctors for the III(j) process, Blevins rejected orthopedic surgeons and chose, instead, Dr. Sethi who, like Steinman was one of CCC's workers' compensation evaluators, but who, also like Steinman, lacked any semblance of expertise in osteoporosis.

45

Although CCC could not directly control the III(j) process to ensure that Anderson would not return to work, it certainly tried to do so through its selection of doctors and, in this case, its effort succeeded.[34]

The question is whether one believes that CCC's decisions and choices flowed from an altruistic concern for Anderson's well being or whether its true concern involved CCC's compensation costs.[35] The fact that CCC is self-insured and is so concerned about keeping costs down that it regularly sends its mine site HR managers reports on how much workers' compensation claims filed by CCC employees have cost is a fact that, *considered with all of the other evidence*, supports an inference that of pretext and discrimination.[36]

Not only was CCC concerned about compensation costs, it was particularly concerned about the injury of individuals with osteoporosis. When Anderson was

---

[34] The jury can also consider the nature of the risk. According to Dr. Steinman, Anderson is, at worst, at risk of a non-life threatening fracture that will not endanger the health or safety of others.

[35] Some might believe that CCC should be able to deny employment based on potential workers' compensation costs. However, such a belief is inconsistent with West Virginia law which protects individuals with compensation claims from discrimination and provides some job security. W. Va. Code § 23-5A-1 and 23-5A-3. Moreover, CCC has never raised such a defense.

[36] Although there is nothing unusual about a company's concern about compensation costs, there is no reason to send actual case costs on a regular basis to a mine site HR manager. The HR manager may need to know about injuries to address mine safety, but reminding HR managers of the cost of benefits paid to each injured miners appears calculated to send a different message: these benefits are costing us too much. HR manager Layton explained that CCC was concerned about costs and would like to "keep costs down for a business. It's still a business." JA0191-0194. In such an atmosphere, there is an incentive to challenge the return to work of miners who may be viewed as a workers' compensation liability.

cleared to return to work, Blevins was concerned that Anderson might become another Jones. In an email concerning an appointment for Anderson, Burford reported that she had "just confirmed with Helen [Blevins] that she wants another IME set up on this employee [Ms. Anderson] just like [Ms. Jones]." JA0485. Later, Blevins emailed CCC General Manager, Benefits Program, Philip Nicholson telling him that Joyce Anderson was "another Mrs. Jones." JA0870. In Blevins' mind, Anderson was potentially another coal miner with a second workers' compensation claim on the way.

The court also erred by misconstruing the plaintiff's case stating:

> the plaintiff primarily argues that because the defendant is self-insured, items such as workers' compensation claims are paid through corporate funds. Accordingly, plaintiff argues that the fact that plaintiff filed a workers' compensation claim was a significant factor behind the defendant's motive to terminate her employment."

JA1036. Although Anderson does contend that CCC's concern about its compensation costs, particularly in light of its self-insured status, is relevant, the court errs in characterizing CCC's self-insured status as plaintiff's *primary* argument and in failing to consider all of the evidence and inferences Anderson presented in support of her claim.

Finally, credibility always matters in evaluating pretext and Blevins credibility is very much at issue. For example, Blevins tried to deny her involvement in choosing Dr. Steinman and Dr. Ripepi stating she did not choose Steinman to conduct the examination of Ms. Anderson and did not choose Ripepi to review Dr. Steinman's opinion. JA0378; JA0448 ("Q. And you don't know why they arranged for Dr. Ripepi? A. No. I said that they were going to arrange for a file review."). Yet, Wells Fargo manager Burford testified that Ms. Blevins expressly directed her to

47

assign the Anderson medical evaluation to Dr. Steinman and to contact Dr. Ripepi to review Dr. Steinman's report.  JA0468; JA0472.

Given the evidence presented by Anderson, there are genuine issues of material fact and the district court's decision should be reversed and remanded.

## CONCLUSION

The evidence demonstrates there are genuine issues of material fact as to whether Anderson workers' compensation claims were a significant factor in CCC's decision to pursue her discharge.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests that this Court hear oral argument in this case. This appeal raises important questions about (a) the issues that arise when an employer seeks to discharge an employee because she allegedly presents a risk to herself or others under the "direct threat" provisions of the HRA, (b) the use and abuse of alleged medical experts chosen by an employer more because of their relationship to the employer than because of their knowledge of, or expertise in, the relevant medical field and (c) the discharge of an employee whose medical condition may impact workers' compensation costs.

PLAINTIFF,
BY COUNSEL.


/s/ *Allan N. Karlin*
ALLAN N. KARLIN
WV BAR # 1953
ALLAN N. KARLIN & ASSOCIATES
174 CHANCERY ROW
MORGANTOWN, WV  26505
304-296-8266

48

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____        Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on  December 8, 2014  the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Larry J. Rector, WV Bar # 6814              Denielle Stritch
Steptoe & Johnson                           Steptoe & Johnson
400 White Oaks Boulevard                    600 17th Street
Bridgeport, WV 26330                        Suite 2300 South
                                            Denver, CO 80202

_____                   _____
Signature                                   Date

# ADDENDUM

77CSR1

# TITLE 77
## LEGISLATIVE RULES
## HUMAN RIGHTS COMMISSION

### SERIES 1
### RULES REGARDING DISCRIMINATION
### AGAINST INDIVIDUALS WITH DISABILITIES

**§77-1-1. General.**

1.1. Scope. -- The following legislative regulations of the West Virginia Human Rights Act set forth rules for complying with the disability provisions of the West Virginia Human Rights Act, W.Va. Code §5-11-1 et seq., and are intended to interpret and implement the provisions of the West Virginia Human Rights Act, particularly the 1989 amendments relating to handicap disability discrimination, and to assist all persons in understanding their rights, obligations, and duties under the law.

In these regulations, the word "handicap" and its derivations are replaced by the word "disability" and its derivations in order to conform with the Americans with Disabilities Act of 1990, §§101-108, 42 U.S.C. §§12111-12117, even though the provisions of the West Virginia Human Rights Act, W. Va. Code §5-11-1 et seq. uses the term "handicap."

1.2. Authority. -- W. Va. Code §§5-11-8(h); 29A-3-1 et seq. and 5-11A-20.

1.3. Filing Date. -- May 19, 1994.

1.4. Effective Date. -- May 19, 1994.

**§77-1-2. Definitions.**

2.1. "Disability" means, with respect to an individual--:

2.1.1. A mental or physical impairment which substantially limits one or more of a person's major life activities; or

2.1.2. A record of such impairment; or

2.1.3. Perception of such an impairment.

2.1.4. This term does not include persons whose current use of or addiction to alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat (as defined in Rule 4.8) to property or the safety of others.

2.2. "Physical Impairment" means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory; speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine.

2.3. "Mental Impairment" means any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term "mental impairment" shall not include:

2.3.1. Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

2.3.2. Compulsive gambling, kleptomania, or pyromania;

2.3.3. Psychoactive substance use disorders resulting from current illegal use of drugs.

2.4. "Physical or Mental Impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech, and

1

hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, and emotional illness.

2.5.  "Substantially Limits" means:

2.5.1.  The inability to perform a major life activity that the average person in the general population can perform;

2.5.2.  A significant restriction as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major activity; but

2.5.3.  Substantially limits does not include or mean minor temporary ailments or injuries.  Examples of minor temporary ailments are colds or flu, or sprains or minor injuries.

2.6.  "Major Life Activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, transportation, and adapting to housing.

2.7.  "Has a Record of Such Impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially   limits one or more major life activities.

2.8.  "Is Regarded as Having an Impairment" means any of the following:

2.8.1.  Has a physical or mental impairment that does not substantially limit major life activities but is treated by another as having such a limitation;

2.8.2.  Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

2.8.3.  Has none of the impairments defined above but is treated by another as having such an impairment.

§77-1-3.  Verification of Disability.

3.1.  If, at the time of public hearing, there is a question or dispute as to whether the complainant is an individual with a disability, or as to the nature of the impairment, the burden of proof shall be upon the complainant to present by reasonable medical opinions or records:

3.1.1.  The nature of the disability;

3.1.2.  Any limitations caused by said disability; and

3.1.3. Any restrictions upon the disabled individuals' work activity.  If the complainant prevails, the costs of obtaining and presenting such medical evidence may be assessed against the respondent.

3.2.  It is intended that medical evidence will be required only in cases where there is an actual dispute as to the nature or medical implications of the disability.

§77-1-4.    Employment  Discrimination Prohibited.

4.1.  No employer shall, on the basis of disability, subject any qualified individual with a disability to discrimination in employment as it relates to:

4.1.1.  Recruitment, advertising, and processing applications;

4.1.2.  Hiring, upgrading, promotion, award of tenure, demotion,  transfer, layoff, termination, right of return from layoff, and rehiring;

4.1.3. Rates of pay or any other form of compensation or changes in compensation;

2

4.1.4. Job assignments, job classifications, organizational structures, position description, lines of progression, and seniority lists;

4.1.5. Leaves of absence, sick leave, or any other leave;

4.1.6. Fringe benefits, such as medical, hospital, accident, disability, life insurance, retirement benefits, unemployment benefits, and profit sharing and bonus plan, whether or not administered by the recipient;

4.1.7. Selection and/or financial support for training, including apprenticeship, professional meetings, conferences, and other related activities and leaves of absence to pursue training;

4.1.8. Employer-sponsored activities, including social or recreational programs;

4.1.9. Any other terms, conditions, or privileges of employment.

4.2. "Qualified Individual with a Disability" means an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description may be considered evidence of the essential functions of the job. A job function may be considered essential for several reasons, including but not limited to the following:

4.2.1. The function may be essential because the reason the employment position exists is to perform that function;

4.2.2. The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

4.2.3. The function may be essential because of the amount of time spent on the job performing the function.

4.3. "Able and Competent" means that, with or without reasonable accommodation, an individual is currently capable of performing the work and can do the work without posing a direct threat (as defined in Section 4.8) of injury to the health and safety of either other employees or the public.

4.4. "Reasonable Accommodation" means reasonable modifications or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which he was hired. Reasonable accommodation requires that an employer make reasonable modifications or adjustments designed as attempts to enable an individual with a disability to remain in the position for which she/he was hired.

4.5. An employer shall make reasonable accommodation to the known physical or mental impairments of qualified individuals with disabilities where necessary to enable a qualified individual with a disability to perform the essential functions of the job. Reasonable accommodations include, but are not limited to:

4.5.1. Making faculties used by individuals with disabilities, including common areas used by all employees such as hallways, restrooms, cafeterias and lounges, readily accessible to and usable by individuals with disabilities;

4.5.2. Job restructuring, part-time or modified work schedules, reassignment to a vacant position for which the person is able and competent (as defined in Section 4.3) to perform, acquisition or modification of equipment or devices, the provision of readers or interpreters, and similar actions;

4.5.3. Appropriate adjustments or modifications of examinations, training materials or policies; and

4.5.4. The preparation of fellow workers for the individual with a disability, to obtain their understanding of the limitations of the disability and their cooperation in accepting other reasonable

77CSR1

accommodations for the individual with a disability.

4.6. An employer shall not be required to make such accommodation if she/he can establish that the accommodation would be unreasonable because it imposes undue hardship on the conduct of his/her business. The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in the following subparagraphs (4.6.1 - 4.6.5);

4.6.1. The overall financial resources of the employer; the overall size of the employer's operation with respect to the number of its employees; the number, type and location of its facilities;

4.6.2. The nature of the employer's operation, including composition, structure and functions of the employer's workforce; the geographic separateness, administrative or fiscal relationship of the employer's facility or facilities;

4.6.3. The nature and cost of the accommodations needed (taking into account alternate sources of funding, such as Division of Vocational Rehabilitation); the effect on expenses and resources, or the impact otherwise of such accommodation upon the employer's operation;

4.6.4. The possibility that the same accommodations may be able to be used by other prospective employees;

4.6.5. The requirements of the West Virginia Law on Handicapped Persons and Public Buildings and Facilities, W. Va. Code §18-l0F-1 et seq. Any changes or alterations required due to the failure of the employer (or his lessee, lessor, or predecessor in title) to conform to the requirements of said statute will be considered per se reasonable.

4.7. Each individual's ability to perform a particular job must be assessed on an individual basis. An employer may refuse to hire or may discharge a qualified individual with a disability if, even after reasonable accommodation, the individual is unable to perform the essential functions of the job without creating a substantial hazard to his/her health and safety or the health and safety of others. However, any such decision shall be used upon the individual's actual abilities, and not upon general assumptions or stereotypes about persons with particular mental or physical disabilities.

4.8. In deciding whether an individual poses a direct threat to health and safety, the employer has the burden of demonstrating that a reasonable probability of a materially enhanced risk of substantial harm to the health or safety of the individual or others cannot be eliminated or reduced by reasonable accommodation. The employer's determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgement that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, factors to be considered include:

4.8.1. The duration of the risk;

4.8.2. The nature and severity of the potential harm;

4.8.3. The likelihood that the potential harm will occur; and

4.8.4. The imminence of the potential harm.

4.9. An employer shall not discriminate against an applicant or employee because of a disability or impairment which is not presently job related but which may worsen and become job related in the future; Provided, that this section shall not be construed so as to impose an undue hardship on the employer. In determining whether the requirements of this section impose an undue hardship on the employer, the Commission shall consider:

4

4.9.1.  The length, cost, and nature of training required for the job;

4.9.2.  The length of time that is likely to elapse before the condition becomes job related;

4.9.3.  The normal turnover for the position;

4.9.4.  The factors listed in Rule 4.6.

4.10.  W.Va. Code §5-11-9 provides an exception to the prohibition of discrimination in employment when such discrimination is based on a bona fide occupational qualification (B.F.O.Q.).  The Commission construes the B.F.O.Q. very narrowly and requires that, in order to establish a B.F.O.Q. which excludes all persons with a particular disability, an employer must prove that all or virtually all persons with that particular disability would be unable to perform the essential functions of the job involved.

4.11.  The following are examples of actions which do not warrant application of the B.F.O.Q. exception and which constitute unlawful discrimination with respect to disability:

4.11.1.  Refusal to select an individual with a disability because of the preference (or assumptions about the preferences) of co-workers, customers, or clients;

4.11.2.  Refusal to select an individual with a disability or a position because of uninsurability or increased cost of insurance (whether actual or anticipated).

4.12.  The following is an example of a B.F.O.Q. based upon disability which may be permitted:

4.12.1.  Physical standards for employment which are directly related to safe performance of the job and are based upon complete factual information concerning working conditions and hazards, and essential physical requirements of each job.

4.13.  When an individual acquires a disability in the course of employment, the employer shall, if possible through reasonable accommodation, continue the individual in the same position, or may reassign the employee to a new position for which she/he is qualified or for which, with training, she/he may become qualified. The requirements of this subsection shall be interpreted in such a way as to be consistent with W.Va. Code §23-5A-l, which prohibits employers from discriminating against employees because they have applied for or received Worker's Compensation benefits.

4.14.  An employer shall offer employees with disabilities the same opportunity as nondisabled employees to obtain health and life insurance benefits, and no individuals with disabilities shall, on the basis of disability, be denied health and life insurance benefits provided in connection with employment, unless otherwise authorized by law.  It shall not be an unlawful discriminatory practice for an employer to observe the provisions of any bona fide pension, retirement, group or employee insurance, or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this rule.

4.15.  If an applicant is refused employment, or an employee is discriminated against in any term, condition, or privilege of employment, because of a disability, the burden shall be upon the employer to establish that  the refusal or discrimination was based upon a bona fide occupational qualification, (as defined in Section 4.10.) or that, even with reasonable accommodation, the employee would be unable safely and adequately to perform the essential functions of that job, or that employment of an individual with a disability would impose an undue hardship upon the employer under the circumstances described in Section 4.6.

§77-1-5.  Pre-Employment Practices.

5.1.  An employer, labor organization, or employment agency shall not make pre-employment inquiry of an applicant as to whether the applicant has a physical or mental impairment

5

**77CSR1**

or as to the nature or severity of such impairment, except that an employer, labor organization, or employment agency may make pre-employment inquires into the ability of a job applicant to perform job-related functions.

5.2. An employer may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination if:

5.2.1. All entering employees are subjected to such an examination regardless of disability;

5.2.2. Information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files, and is treated as confidential medical record, except that --

5.2.2.A. Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

5.2.2.B. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

5.2.2.C. Government officials investigating compliance with this Act shall be provided relevant information on request; and.

5.2.3. The results of such examination are used only in accordance with these regulations.

5.3. An employer shall not use any test or other selection criteria that discriminates against individuals with disabilities unless:

5.3.1. The employer can demonstrate that the test or other criteria is job related for the job in question; and

5.3.2. The employer can demonstrate that there is not an alternate test or set of criteria that has less discriminatory impact.

5.4. An employer shall select and administer tests concerning employment so as to best ensure that the test results accurately reflect the applicant's job skills, aptitude, or whatever factor the test purports to measure, rather than measuring the applicant's impaired sensory, manual or speech skills, unless those skills are the ones the test purports to measure. The employer shall make reasonable accommodations for individuals with disabilities in testing, upon request, by providing such adaptive equipment as may be necessary and modifying testing procedures as appropriate. The employer shall supply such necessary and reasonable equipment for taking the test as the applicant shall request.

5.5. After commencement of employee's employment duties, an employer shall not require a medical examination and shall not make inquires of an employee as to whether such employee has a disability or as to the nature or severity of the disability, unless:

5.5.1. Such examination or inquire is shown to be job related and consistent with business necessity; or

5.5.2. Such examination is a voluntary medical examination, including voluntary medical histories, which are part of an employee health program available to employees at that work site; and

5.5.3. Information obtained under subparagraphs 5.5.1 and 5.5.2 regarding medical condition or history of any employee are subject to the requirements of subparagraphs 5.2.2 and 5.2.3 of Section 5.2

5.6. For purposes of this Act, a test to determine the illegal use of drugs shall not be considered a medical examination, and noting in this Act shall be construed to encourage, prohibit or authorize the conducting of testing for the illegal use of drugs by job applicants or employees

6

or making employment decisions based on such test results.

**§77-1-6. Housing Discrimination Prohibited.**

6.1. The following guidelines on discrimination in housing apply to owners, lessees, sublessees, assignees, or managing agents of, or other persons having the right of ownership or possession of the right to sell, rent, lease, assign, or sublease any housing accommodations or real property or part or portion thereof, or any agents or employees of any of them, or any real estate brokers, real estate salespersons, or employees or agents thereof.

6.2. It is unlawful to print, circulate, issue, display, post or mail, or cause to be printed, published, circulated, issued, displayed, posted or mailed any statement, advertisement, publication, or sign, or to use any form or application for the purchase, rental, lease, assignment or sublease of any housing accommodations or real property or part or portion thereof, which expresses, directly or indirectly, any discrimination as to disability or any intent to make any such discrimination and the production of any statement, advertisement, publicity, sign, form or application, record or inquiry purporting to be made by any such person shall be prima facie evidence in any action that the same was authorized by such person.

6.3. It is unlawful for any person to make any written or oral record or inquiry, or require the completion of any application which seeks information concerning the disability of any prospective purchaser, tenant, or prospective occupant of any housing accommodations or real property unless such information is required by an agency of state or federal government and the person states clearly that the information requested is intended for use solely by the government agency.

6.4. It is unlawful for any real estate broker, agent or salesperson to accept for listing any housing accommodation when the seller or lessor or his agent has expressed, directly or indirectly,

an intention to discriminate against individuals with disabilities.

6.5. It is unlawful for any person to refuse to sell, rent, lease, assign or sublessee, or to evict or otherwise to deny to or withhold from any person or group of persons any housing accommodations or real property, because of the disability of such person or group of persons. For example, a representation to any person, because that person possesses a disability, that real property is not available for inspection, sale or rental, when such real property is in fact so available, is a violation of the Act. Likewise, it is unlawful for any broker, agency, or salesperson to misrepresent the price of real property listed for sale, rent or lease or to fail to communicate to the seller or lessor any offer made by a prospective buyer or lessor because the applicant or prospective applicant possesses a disability.

6.6. It is unlawful for any person to fail or refuse to show, rent, or lease any housing accommodations or real property to a person with a disability who is required to be accompanied by a guide animal or by an attendant; or to evict any person for this reason. Policies which restrict the availability of housing accommodations to persons without pets shall be void with respect to persons with a disability who require guide animals.

6.7. It is unlawful to discriminate against any person or group of persons because of their disability in the price, terms, conditions, or privileges of the sale, rental, or lease of any housing accommodations or real property, or in the furnishing of faculties or services in connection therewith. Individuals with disabilities shall not be required to pay extra compensation due to the fact that they need special aids, accessories, or adaptive equipment.

6.8. It shall be unlawful for any person to refuse to make reasonable accommodations necessary for making housing accommodations or real property accessible to and functional for individuals with disabilities who rent, lease, or sublease any such housing accommodations or real

77CSR1

property. In determining whether an accommodation is reasonable, the Commission shall consider:

6.8.1. The nature of the housing accommodation or real property and the number of living units, if any, which comprise it;

6.8.2. The nature and cost of the accommodation needed (taking into account alternate sources of funding, such as the Division of Vocational Rehabilitation);

6.8.3. Whether or not the housing accommodation or real property was purchased or improved with public funds; and

6.8.4. The requirements of the West Virginia Law on Handicapped Persons and Public Buildings and Facilities, W.Va. Code §18-l0F-l et seq. Any changes or alterations required due to the failure of the owner, managing agent of the owner (or his lessee or predecessor in title) to conform to the requirements of said statute will be considered per se reasonable.

6.9. It is unlawful for any person or financial institution or lender to whom application is made for financial assistance for the purchase, acquisition, construction, rehabilitation, repair or maintenance of any housing accommodations or real property, or any agent or employee thereof to:

6.9.1. Discriminate against any person or group of persons because of the disability of such person or group of persons, or of the prospective occupants or tenants of such housing accommodation or real property, in the granting, withholding, extending, modifying or renewing, or in the fixing of the rates, terms, conditions, or provisions of any such financial assistance or in the extension of services in connection therewith; or to

6.9.2. Use any form of application for such financial assistance or to make any record of inquiry in connection with applications for such financial assistance which expresses, directly or indirectly, any discrimination as to disability or any intent to make any such discrimination, unless such information is required by an agency of the state or federal government, and the person making the inquiry states clearly that the information requested is intended for use solely by the government agency.

§77-1-7. Public Accommodations.

7.1. These regulations apply to any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodations as defined by W.Va. Code §5-11-2(j).

7.2. It shall be unlawful to refuse, withhold from, or deny, either directly or indirectly, to any individual because of disability, any of the accommodations, advantages, facilities, privileges, or services to qualified individuals with disabilities, the privileges of such place of public accommodation.

7.3. It shall be unlawful to publish, circulate, issue, display, post, or mail, either directly or indirectly, any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, privileges, or services of any such place shall be refused, withheld from, or denied to any individual on account of disability, or that the patronage or custom threat of any individual with a disability is unwelcome, objectionable, not acceptable, undesired, or not solicited. However, any person may advertise that a place of public accommodation is barrier free or otherwise accessible to individuals with disabilities.

7.4. It is unlawful to discriminate against an individual with a disability in the price, terms, or conditions upon which access to the accommodations, advantages, facilities, services, or privileges of any public accommodation may depend.

7.5. Individuals with disabilities have the right to be accompanied by a guide animal in any place of public accommodation.

7.6. Individuals with disabilities have the right to be accompanied by an attendant in any place of public accommodation.

8

**77CSR1**

7.7.  It shall be unlawful to refuse to make reasonable accommodations necessary to make any public accommodation accessible to and functional for individuals with disabilities.  In determining whether an accommodation is reasonable, the Commission shall consider:

7.7.1.  The nature and size of the public accommodation;

7.7.2.  The nature and cost of the accommodation needed;

7.7.3.  Whether or not the public accommodation is owned, operated, funded, or used, by an agency of government; and

7.7.4.  The requirements of the West Virginia Law on Handicapped Persons and Public Buildings and Facilities, W.Va. Code § 18-l0F-1 et seq.  Any changes or alterations required due to the failure of the owner, managing agent of the owner (or his lessee or predecessor in title) to conform to the requirements of said statute will be considered per se reasonable.